Cambridge Hotels, Inc. v. Commissioner. Chauncey D. Steele, Jr., and Marian E. Steele v. Commissioner.
Cambridge Hotels, Inc. v. Commissioner
Docket Nos. 2041-66, 2042-66.
United States Tax Court
T.C. Memo 1968-263; 1968 Tax Ct. Memo LEXIS 37; 27 T.C.M. (CCH) 1411; T.C.M. (RIA) 68263; November 19, 1968. Filed *37 Deductibility by corporate petitioner of various expenses of its principal officer and stockholder, a well-known amateur tennis player, paid by the corporation, determined. Payments by corporation of personal expenses of its principal officer and stockholder are taxable to officer-stockholder as dividends. Value of a painting donated by individual petitioners to a church determined; value is deductible as a charitable contribution. Individual petitioners failed to prove that nonbusiness bad debts became worthless in 1961; deduction denied. Daniel O. Mahoney, Boston, Mass., for the petitioners. Robert B. Dugan and Jeffrey H. Hubbard, for the respondent. DRENNEN
*38 Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined the following deficiencies in income tax: Taxable year
Docket No.
Petitioner
ended
Deficiency
2041-66
Cambridge Hotels,
Aug. 31, 1960
$7,174.97
Inc
Aug. 31, 1961
13,762.49
Aug. 31, 1962
4,623.38
2042-66
Chauncey D.
Dec. 31, 1960
7,142.37
Steele, Jr. and
Marian E. Steele
Dec. 31, 1961
5,677.23 1412 The issues in these consolidated cases are: (1) Whether certain expenditures made by Cambridge Hotels, Inc., for its principal officer and majority stockholder, *39 Chauncey D. Steele, Jr., for his tennis and golf activities and for certain other activities during the taxable years here involved are properly deductible by the corporation as ordinary and necessary business expenses under section 162, I.R.C. 1954, [1] and whether certain other expenditures incurred by the corporation during these taxable years are properly deductible under section 162; (2) whether any of the above expenditures incurred by Cambridge Hotels, Inc., constitute dividend income to Chauncey D. Steele, Jr., in the years 1960 and 1961; (3) whether the individual petitioners Chauncey D. Steele, Jr., and Marian E. Steele are entitled to deduct $1,075 in 1961 as a charitable deduction under section 170 for the contribution to a church of a portrait painted by Marian E. Steele; and (4) whether the individual petitioners are entitled to a nonbusiness bad debt deduction under section 166(d) in 1961 in the amount of $2,044.34. Concessions made by both parties as to the deductibility of some of the expenditures made by Cambridge Hotels, Inc. *40 , will be given effect in the Rule 50 computation. Findings of Fact Some of the facts were stipulated and they are so found. Cambridge Hotels, Inc., is a corporation organized in 1952 under the laws of Massachusetts with its principal place of business at 29 Garden Street, Cambridge, Mass. The corporation kept its books on an accrual basis with its taxable year ending August 31. It filed its corporate income tax returns for the taxable years ended August 31, 1960, 1961, and 1962 with the district director of internal revenue, Boston, Mass.
Chauncey D. Steele, Jr., and Marian E. Steele were husband and wife in 1960 and 1961. At the time the petition was filed petitioner Chauncey D. Steele, Jr., resided at 29 Garden Street, Cambridge, Mass. Chauncey D. Steele, Jr., and Marian E. Steele filed joint income tax returns for the years 1960 and 1961 with the district director of internal revenue, Boston, Mass. Chauncey D. Steele, Jr., and Marian E. Steele have two children, Chauncey Depew Steele, III, born on February 16, 1944, and Pamela Marian Steele, born April 12, 1947. During the taxable years here involved Cambridge Hotels, Inc., was engaged in the operation of the Hotel *41 Continental and residential apartment buildings located in Cambridge, Mass. The Hotel Continental was a transient and residential hotel with 159 rooms and 112 keys, located at 29 Garden Street; Continental Manor was a 66-unit apartment building located at 16 Chauncey Street about a half block away from the Hotel Continental; and Continental Apartments was a 38-unit apartment building located at 20-22 Concord Avenue. Cambridge Hotels, Inc., also operated several rooming houses in Cambridge during the years before us. The Hotel Continental has one of the largest ballrooms in New England with a capacity of about 750 persons. The Sheraton Commander Hotel which, at the time of trial had about 110 rooms for transients and about 70 apartments, is located diagonally across the street from the Hotel Continental. About 1952 the residential occupancy rate of the Hotel Continental was approximately 10 or 15 percent and the remaining space was devoted to transients. At the time of the trial the clientele of the Hotel Continental was about 85 percent transient. Over the years the percentage of the hotel space devoted to transient use or to residental use has fluctuated according to business *42 conditions. Chauncey D. Steele, Jr., was employed in 1940 by the Hotel Continental (then operated by the Sheraton Corporation) as a steward, became assistant manager in 1941 at the age of 26 and, after a leave of absence from August 1942 to December 1945 for service in the United States Navy, he returned to the hotel as general manager. In 1952 Steele and several associates organized Cambridge Hotels, Inc., and in that year the corporation acquired the Hotel Continental, Continental Apartments, and Continental Manor. During the years in issue Steele owned 72 percent of the stock of Cambridge Hotels, Inc., and served as president, treasurer, general manager, and director of the corporation. He was in charge of personnel, supervised daily purchases of food and beverages and other supplies, signed all leases, served as 1413 functions manager and sales representative for hotel facilities and also served as advertising and public relations director. At the time of the trial Steele owned almost 100 percent of the stock of Cambridge Hotels, Inc., and his mother owned the remaining small percentage of stock. Steele has had a lifelong interest in the sport of amateur tennis and has *43 participated in tournament play in many divisions of amateur tennis in the United States. He was captain of the Columbia University Tennis team in his junior year and he has held national ranking in the men's division for 4 years. In 1939 he was runner-up in the National Singles Championship, men's division. He has participated in singles and doubles in the men's division, the senior men's division, and the father and son division, and at the time of trial was ranked No. 1 in the father and son division. Steele has won 28 New England titles in all divisions. During the years in issue he was ranked No. 1 in the New England senior men's division and No. 3 and No. 2 in this division in the United States. Steele has been in the finals of 32 national championships, winning 8 and being runner-up in 24. Steele has been active in tennis at the Longwood Cricket Club, Brookline, Mass., and at the Essex County Club, Manchester, Mass. He has served as president of the Longwood Cricket Club and in the years in issue was a member of the advisory board of that club. He was president of the New England Lawn Tennis Association for 5 years prior to the years in issue, and he has served as chairman *44 of the Davis Cup Selection Committee of the United States Lawn Tennis Association and as delegate from New England to the United States Lawn Tennis Association. He has also served on numerous committees of the United States Lawn Tennis Association. In 1953 he received the Johnston Award from the United States Lawn Tennis Association which is given annually to the player who has contributed most to amateur tennis in the United States. In order to attain New England Lawn Tennis Association ranking in amateur tennis it is necessary to participate annually in at least three New England championship tournaments in one's division and in order to attain United States Lawn Tennis Association ranking in amateur tennis it is considered essential to participate annually in at least three national championship tournaments. Steele has also been active in amateur golf and during the years here in issue he had a three-handicap. His golfing activities have been principally in the New England area, including participation in various club tournaments. He has been club champion at the Essex County Club and on one occasion was runner-up at the Brae Burn Country Club in Newton, Mass. He has also played *45 in the Tonrnament of Champions sponsored by the Boston Herald at the Belmont Country Club in Belmont, Mass. During the period in issue Cambridge Hotels, Inc., owned a white Lincoln Continental Mark II which it had purchased in 1955. This automobile was used extensively by Steele who used it for tennis trips, golf tournaments, and visits to his local golf clubs. During the years in issue Marian E. Steele used a Jeep station wagon which was registered jointly in the names of Chauncey D. Steele, Jr., and Marian E. Steele. Although the Jeep was used mostly by Marian, it was also on occasion used by her husband. During the years in issue Steele was a member of the Young Presidents' Organization, an organization of individuals who, before reaching the age of 40, became presidents of companies doing business of more than $1 million annually. At the annual conventions of the organization, lectures were offered in the mornings on various business and nonbusiness subjects and the afternoons were devoted to social events. During the years in issue Steele was accompanied to the conventions by his wife. During the years in issue Steele participated in an investment club which met once a week. *46 The club's investments have included two gas wells and some stocks. During the years involved, Cambridge Hotels, Inc., paid various expenses incurred by Steele in connection with all of the above activities and claimed the amounts so paid as deductions on its returns for those years. Respondent disallowed the deduction of a large portion of these expenditures. The amounts of such expenditures claimed on the returns and the amounts allowed and disallowed by respondent for each of the years involved are set out in the tables below, and are discussed in the context of the activities mentioned above in the opinion. Marian E. Steele graduated from the Academy of Fine Arts in Philadelphia and in 1936 won a scholarship to Europe to further her education. She returned to the Academy in 1938 as a post-graduate student. Her first commission when she left 1414 the Academy was a portrait (34 inches by 38 inches) in 1937 of Governor Harold Hoffman of New Jersey, for which she received $1,200. She has sold many portraits since then and has won a number of prizes. At the time of the trial she was active as a professional artist, with an agent and with membership in the Guild of Boston Art. *47 In about 1961 or 1962 she painted a portrait (30 inches by 36 inches) of one E. Bartlett Osborne in New York City for which she received about $1,000. In 1961 Marian and her husband donated to the First Congregational Church in Cambridge, Mass., a framed portrait (30 inches by 36 inches) painted by Marian of the Minister of that church. In the joint income tax returns filed by Chauncey D. Steele, Jr., and Marian E. Steele for 1960 and 1961 Marian reported total receipts from her activities as an artist in the respective amounts of $2,354 and $1,158 and in the same taxable years reported total deductions in the respective amounts of $2,266.03 and $1,925.39. In their joint income tax return for 1961 Chauncey D. Steele, Jr., and Marian E. Steele claimed a deduction as a charitable contribution in the amount of $1,075 for the portrait donated by them in that year to the First Congregational Church in Cambridge. Respondent disallowed the deduction in full. In the joint income tax return for 1961 petitioner Chauncey D. Steele, Jr., claimed a nonbusiness bad debt of $1,782.34 as cosigner on the defaulted note of George Pellinger and also a nonbusiness bad debt of $262 as cosigner on *48 the defaulted note of Edward McCaffrey. [2] Respondent disallowed both of the nonbusiness bad debts claimed on the return. In addition to the payments made by Cambridge Hotels, Inc., for expenditures incurred by Steele in his tennis and golfing activities and the other expenditures outlined above, the hotel corporation paid for expenditures incurred by Steele during the years in issue at various restaurants, for tickets and attendance by him at various social affairs, for the entertainment of hotel guests by Steele, and for the purchase of season tickets for hockey and baseball games. Cambridge Hotels, Inc., claimed the following business expense deductions in its corporate income tax returns for the taxable years ended August 31, 1960, through 1962. F/Y ended
Meetings
Travel
Advertising,
Trade dues
Automobile
Aug.31,
and
promotion
expenses
Luncheons
& entertainment
1960
$4,522.22
$6,386.69
$23,926.49$
$2,643.02
$2,364.90
1961
3,844.92
3,396.75
26,220.22
2,947.45
2,527.47
1962
5,515.91
3,789.84
33,539.57
3,040.20
1,982.75
*49 Respondent allowed the following portions of the above deductions claimed by the hotel corporation on its tax returns and disallowed the remaining balances: F/Y ended
Meetings
Travel
Advertising,
Trade dues
Automobileexpenses
Aug.31,
and
promotion
Luncheons
&entertainment
1960
$ 655.15
$ 688.33
$21,516.03
$1,751.25
$ 975.84
1961
494.69
467.04
25,412.62
2,192.15
1,172.22
1962
830.80
191.86
32,512.33
1,887.40
947.58
On brief the respondent shows changes in the amounts allowed as deductions for the following items: F/Y ended
Meetings
Travel
Advertising,
Trade dues
Automobileexpenses
Aug.31,
and
promotion
Luncheons
&entertainment
1960
$734.72
$694. 92
No change
No change
$1,087.18
1961
525.42
No change
No change
No change
1,160.27
1962
840.30
No change
No change
No change
855.18 1415 Opinion The first issue is whether the respondent properly disallowed the deduction by Cambridge Hotels, Inc., of certain expenditures as ordinary and necessary business expenses under section 162 in the taxable years ended August 31, 1960, through 1962. These expenditures *50 were numerous and they are listed in detail on more than 50 pages of exhibits introduced in evidence. The expenditures were largely incurred by Chauncey D. Steele, Jr., the majority stockholder and chief executive officer of the hotel corporation, and they include some expenditures incurred by his wife and children. The hotel corporation on brief has placed these myriad expenditures in the following major categories: (1) Tennis activities; (2) golf activities; (3) use of Continental automobile; (4) Young Presidents' Organization; (5) investment club meetings; (6) dinners at restaurants; (7) social affairs; (8) entertainment of hotel guests; (9) sports events tickets; and (10) hotel and apartment-owners' associations, other business meetings and related hotel expenses. [3] We will adhere to these categories in our discussion of this issue. *51 The contention of the hotel corporation as to most of these categories of expenditures is that they were "undertaken as a public relations, promotion, and advertising device which created substantial business for the hotel" and that consequently the hotel corporation is entitled to deduct all such expenditures as ordinary and necessary business expenses. [4]It has the burden to show that a proximate relationship existed between the claimed expenditures and the hotel business, United Aniline Co. v. Commissioner, 316 F. 2d 701, affirming a Memorandum Opinion of this Court, and that such expenditures were reasonably calculated to advertise and otherwise promote the hotel. W.D. Gale, Inc. v. Commissioner, 297 F. 2d 270, affirming a Memorandum Opinion of this Court. It is not enough that some remote or incidental relationship may exist between the expenditures and the hotel corporation's business. Ralph E. Larrabee, 33 T.C. 838. Moreover, the nature of the expenditures here involved, which were largely incurred by the majority stockholder of the hotel *52 corporation in activities in which he had a keen personal interest, was such as to invite close scrutiny. Situations of this kind are peculiary susceptible of abuse and it should be clearly demonstrated that the expenditures in question were prompted by business considerations rather than by social considerations. See Robert Lee Henry, 36 T.C. 879; Eugene H. Walet Jr., 31 T.C. 461, affirmed per curiam 272 F. 2d 694; Louis Greenspon, 23 T.C. 138, affirmed on this point 229 F. 2d 947. Tennis Activities. During the taxable years ended August 31, 1960, 1961, and 1962 Cambridge Hotels, Inc., paid about 90 percent of the expenditures incurred by Chauncey D. Steele, Jr., in his extensive tennis activities. The expenditures in this category include *53 expenses incurred by him in playing in various tournaments on the local, regional, and national level; in connection with various tennis organizations such as the United States Lawn Tennis Association and the New England Lawn Tennis Association; for tennis equipment; and for charges and dues at various tennis clubs. Respondent allowed some expenditures in this 1416 category, including one-half of the dues at the Longwood Cricket Club and the Badminton and Tennis Club in the taxable years 1960 and 1961, one-half of the dues at the Longwood Cricket Club in the taxable year 1962, and one-half of the dues for the New England Lawn Tennis Association in the taxable year 1961. [5]
It is evident from the record that Steele has long been devoted to the game of tennis. In 1939 (while still attending Columbia University where he captained the *54 tennis team in his junior year) Steele was runner-up in the National Singles Championship, men's division, and since then he has continued to play in tournaments in New England and other sections of the United States and has won numerous titles and achieved high rankings in the world of amateur tennis as indicated in our findings of fact. During the years in issue he was ranked No. 1 in the New England senior men's division and was ranked No. 3 and No. 2 in this division in the United States. It also appears that his son has similarly been imbued with a love of tennis and has successfully participated in tournament play with Steele. The hotel corporation contends that the extensive tennis activities of Steele had substantial publicity and promotional value for Cambridge Hotels, Inc., and brought him into contact with businessmen participants, officials, organizing committees, and operators which generated substantial business for the hotel. Steele testified that he played tennis "because of the publicity involved, the promotional value of doing it; I did substantial business from my contacts in tennis." As proof of the business produced for his hotel through his tennis contacts (and *55 through his golf contacts, see infra), Steele introduced in evidence numerous registration cards of the Hotel Continental covering the calendar years 1959, 1960, and the single month of August 1961 which he had personally picked out and identified as individuals who, in Steele's opinion, had come to the hotel through such contracts. [6] In oral testimony at the trial Steele selected a few of the registration cards in evidence for purposes of illustration and explained the connection each hotel guest had with Steele's tennis activities. Some guests were merely identified as tennis players from the United States and from abroad or simply as members of the Longwood Cricket Club, while others were identified as members of tennis or related associations. Steele kept *56 scrapbooks over the years of newspaper items and other publicity concerning his tennis activities and he introduced into evidence two large scrapbooks covering the period here involved. The majority of the clippings merely mention Steele's name and briefly give the results of matches played. Some of the clippings mention the Hotel Continental, together with Steele's name, and some merely identify him as a Cambridge hotelman. Many of the clippings that mention the Hotel Continental or identify Steele as a Cambridge hotelman appear in local newspapers, i.e., Cambridge or Boston. We doubt that these clippings, taken as a whole, furnished any appreciable promotional value for the Hotel Continental with its emphasis on transient trade. [7] Moreover, we seriously doubt that Steele's presence on the tennis courts had any meaningful impact that associated him with the Hotel Continental in the minds of the spectators. *57 We have considered the testimony of Ernest Henderson, chairman of the board of Sheraton Corporation, that "a hotel is to a large degree a reflection of the general manager and to some degree the ownership of the property" and that in his opinion the tennis activities of Steele during the years involved had important publicity value for the hotel. We have also considered the testimony of Thaddeus Beal, president of the Harvard Trust Co. in Cambridge, who was a director and minority stockholder of 1417 Cambridge Hotels, Inc., and whose bank was a creditor of the hotel corporation, that he knew about Steele's tennis activities during this period, including trips to Florida and California, and that the expenses were paid by the hotel corporation. He also testified that these expenditures were discussed by the board of directors during this period and that it was "the opinion of the board that it was warranted on the basis of the publicity for the hotel." The hotel corporation also introduced in evidence a list of functions which took place at the Hotel Continental over the years here involved and Steele testified that all of such functions were brought to the hotel by people he *58 had met through his tennis (and golf) activities. The list also indicates in some instances the nature of the contact that purportedly led to the particular function as well as the approximate amount expended at each function. We are convinced, upon careful review of all the evidence, that Steele's tennis activities were primarily motivated by personal considerations and that any benefits that inured to the hotel corporation were peripheral in nature. The record is permeated with Steele's lifelong enthusiasm for the game of tennis. He obviously derived enormous personal pleasure from the game which, as demonstrated by his high rankings attained over the years, he played with great skill. It also appears that the devotion to tennis is a strong family trait. Steele testified that he started his son in the game when his son was 7 years old and that in the year before the trial Steele and his son won the national father and son event. Steele testified that they were the "first New England team to win it since 1928 and that it was one of the biggest thrills I have ever had." It also appears that years earlier Steele had played in the national father and son tournament with his father. *59 No doubt it is true that Steele's tennis activities created friendships and contacts that resulted in some indirect benefit to the hotel business but as we pointed out in the Larrabee case, this is true of any social relationship and does not necessarily establish that the expenditures for such activities were proximately related to the business. Although we are convinced that the expenditures for Steele's tennis activities were predominantly motivated by personal reasons we feel that some portion of such expenditures actually served to promote the business of the hotel corporation. Where such a dual purpose exists, an allocation of the total expenditures may properly be made between the deductible business expenses and the nondeductible expenses of the corporation. United Aniline Co. v. Commissioner, supra.On the basis of the entire record we find that Cambridge Hotels, Inc., is entitled to deduct as ordinary and necessary business expenses 33 I/3 percent of the expenditures disallowed by respondent in the category of tennis activities. However, before the 33 I/3 percent *60 portion is computed the total expenditures in the tennis category must first be reduced by the expenditures incurred by Steele's wife and his children who accompanied him on some of the tennis trips. There is insufficient evidence in the record to support a finding that the wife's presence (or that of the children) on these trips brought any substantial benefits to the hotel corporation. No showing has been made that any services rendered by the wife on these trips were necessary, directly or indirectly, to the business of the hotel corporation. See L.L. Moorman, 26 T.C. 666, 679. Golf Activities. The expenditures in this category were incurred by Steele for club dues and various charges related to golf and, by Steele's estimate, represent about 70 percent of his total expenditures for golf. They include Steele's expenses when he participated in various tournaments such as the Essex County Club Championship, the Kittansett 4-Ball Tournament, the Massachusetts State Amateur Championship, and the Southern Pines Carousel Golf Tournament. In each of the 3 taxable years here involved the country club charges and dues constitute a substantial portion of the disallowed expenditures, *61 totaling $2,037.67 in 1960, $1,089.8/ in 1961, and $1,393.90 in 1962. Respondent allowed one-half of the dues at the Brae Burn Country Club in each of the taxable years ended August 31, 1960, 1961, and 1962, and only one-half of the dues at the Essex County Club for the period here in issue is involved. Steele had a three-handicap in golf and did not have the same kind of national standing in golf as he did in tennis. His activities were for the most part limited to country club tournaments in the New England area. There is very little in the record to show that any of the disallowed expenditures were proximately related to the hotel business. There is no evidence of any significant newspaper publicity of his golfing activities which would link him with the Hotel Continental. Steele identified 1418 certain functions which took place at the Hotel Continental over this period that purportedly resulted from his golf activities. His testimony as to such causation was extremely general and the evidence to a large degree seems to be a roster of his golfing partners. Any indirect benefit to the hotel that arose from these social relationships does not meet the "proximately-related" *62 test necessary to qualify these expenditures as ordinary and necessary business expenses. Ralph E. Larrabee, supra.On this evidence we do not believe that the hotel corporation is entitled to deduct as business expenses any portion of the expenditures in this category in excess of the amount already allowed by respondent. Use of Continental Automobile. In 1955 Cambridge Hotels, Inc., purchased a white Lincoln Continental Mark II. As far as we can tell from the record, the automobile was used exclusively by Steele. His use of the automobile during the years in issue included tennis trips, golf tournaments, and visits to his local country clubs. During these years the only other automobile in the family was a Jeep station wagon which was used predominantly by Steele's wife. Respondent allowed one-half of the depreciation claimed on the automobile in each of the taxable years August 31, 1960, and 1961 (by which time the automobile was fully depreciated), and also allowed one-half of the gasoline and maintenance expenses claimed for the automobile in each of the taxable years ended August 31, 1960, 1961, and 1962. Steele testified that it was his idea that due to the *63 similarity in names people would identify the automobile with the Hotel Continental and thus create desirable publicity for the hotel. It is evident from the record that Steele used the Continental as a personal car during these years; only if we accepted petitioners' argument that all of Steele's athletic and social activities were related to the business of the hotel, would any more substantial portion of the automobile expenses be considered business expenses of the corporation. We are dubious that the automobile with its fortuitous name substantially benefitted the hotel corporation through some chance association of names. Compare Robert Lee Henry, supra.Respondent has generously allowed onehalf of the expenses and depreciation claimed for the use of the automobile and we do not believe that on this record the hotel corporation has shown it is entitled to deduct any amount in excess of the amounts allowed. Young Presidents' Organization. Steele was a member of this organization of individuals who before age 40 became presidents of companies with a yearly business volume in excess of $1 million. Steele testified that "There are about thirty-five hundred members *64 at this time with about forty-five hundred members from all over the world." The expenditures claimed by the hotel corporation in this category included dues and expenses of travel and attendance at conventions with the major expenses occurring in the taxable year ended August 31, 1960 ($4,096.63), when Steele and his wife attended a regional convention in Bermuda in November 1959 (Castle Harbor Hotel) and a national convention at Miami Beach, Fla., in March 1960 (Hotel Fontainbleau). Steele testified that "the object of the organization is to make one a better president and a better man," and it is the contention of Cambridge Hotels, Inc., that Steele's participation in this organization improved his management skills and also brought substantial business to the hotel organization. Steele also testified that the organization "is of tremendous educational value." It appears that lectures were offered at the conventions in the mornings and that the afternoons and evenings were filled with social events. The lectures covered a broad spectrum of topics. The program of the Bermuda convention was introduced into evidence and indicates lectures over a period of 3 days on such topics as *65 (1) analysis of political and economic facets of the cold war; (2) United States bilateral aid to underdeveloped nations; (3) the roles of international aid and private business in preserving freedom through world development; (4) international opportunities; (5) mergers and acquisitions; (6) tax strategy for the growth company and its owners; and (7) keys to profits. The program for the Miami Beach convention also lists a wide variety of topics offered over a 5-day period, and the classes cover both businessoriented and nonbusiness-oriented subjects. [8]
We do not believe that the hotel corporation has met its burden of showing that the expenditures incurred by Steele in this category were proximately related to the hotel business. Perhaps some indirect 1419 benefits accrued to the Hotel Continental through social contacts made by Steele at meetings and conventions held by this organization but we do not think that these incidental benefits establish a sufficient connection between the expenditures *66 and the hotel business to justify their deduction in whole or in part as business expenses of Cambridge Hotels, Inc. With regard to the programs offered at the convention, there is insufficient evidence to show how much time, if any, Steele spent at such lectures. Moreover, it is our impression that such lectures were aimed at general personal betterment of the participants and at a broader awareness of current public problems on both the national and international scene. We do not believe that the few business-oriented lectures offered over a 3-to 5-day period carry sufficient weight to justify a deduction of any portion of the expenditures in this category as a business expense. We might add that there is no evidence to connect Marian E. Steele's expenses at the conventions with the hotel business and, in fact, she testified that, while she attended a few lectures, she spent most of her time painting. Nor is it enough to show that her presence was helpful to him at the various social functions. We cannot find on the basis of this evidence that the hotel corporation is entitled to deduct any portion of the expenditures in this category as business expenses. Investment Club Meetings. *67 Steele was a member of an investment club which met weekly for dinner, often at the Harvard Club. Among the investments made by the club were two gas wells and some stocks. Steele testified that the investment club was "a flop as far as I am concerned" but that he stayed on because his contacts at the club brought "a tremendous amount of business" to the hotel corporation. We have examined the evidence on this point and we are not persuaded that these expenditures were proximately related to the business of Cambridge Hotels, Inc. On the contrary, the evidence indicates that the club was a personal (and perhaps social) undertaking of Steele individually and any business for the hotel that may have resulted from the social friendships that were made at the club was too indirect to qualify these expenditures of Steele as business expenses of Cambridge Hotels, Inc. Miscellaneous Categories. The hotel corporation deducted expenditures by Steele at various well-known restaurants in the Boston area. The Hotel Continental operated two restaurants in the hotel and Steele testified that when he dined out at the various restaurants he was merely educating himself and keeping himself informed *68 on what was going on in the restaurant field. We have considered the evidence and we do not believe it justifies a finding that these expenses were proximately related to the hotel business. Instead, we are convinced they merely represent an occasional dinner in a fine restaurant for purely personal reasons with no business overtones. The hotel corporation claimed deductions for tickets and attendance by Steele at various social affairs in the Boston area, including school and hospital benefit affairs, dinner dances, and the opera ball. In short, the argument here seems to be that by having Steele attend these various social functions, many of them of long standing, it would somehow enhance the possibility that some of these functions could later be held at the Hotel Continental. While we recognize that businessmen at times feel obligated to support local civic and charitable functions, it is our impression from the evidence that the expenses here involved were incurred for Steele's personal benefit rather than for the benefit of the hotel. On this record, we find that such expenditures were clearly personal in nature and that any connection with the hotel business of Cambridge Hotels, *69 Inc., was much too tenuous to qualify such expenses as business expenses. If the hotel obtained business from some of the organizations whose functions Steele attended, we daresay it was because of the facilities for such functions offered by the hotel. Steele testified that on various occasions he entertained hotel guests by taking them to the movies, to restaurants in the Boston area, and to specific athletic events in the Boston area. A fair interpretation of these activities would be that Steele was merely entertaining individuals who were personal friends, or with whom he was otherwise acquainted and who happened to be hotel guests. We hardly think he would invite a chance hotel guest out to dinner or to a movie in Harvard Square. We cannot find on this record that such expenses were proximately related to the hotel business. Respondent allowed one-half of the expenditures made by Cambridge Hotels, Inc., during the years in issue for season tickets to baseball games and to hockey games in the Boston area, as well as one-half of the expenses for tickets to certain individual sports events. Steele testified that he used 1420 these tickets on occasion for his personal use *70 but that they were purchased primarily to support the teams and to have tickets available for customers of the hotel. We give credence to the argument that the entire expenditure for season tickets to the home games of the local professional athletic clubs is a business expense because it stimulates the hotel business whenever the teams play in the Boston area and that it was good business to support the teams. While disallowance of some of the expense of these season tickets might be made for personal use of the tickets, on the whole we think the benefits derived by the hotel from supporting the local teams and the occasional use of these tickets to entertain hotel guests justifies allowance of a deduction for the entire cost of these season tickets as a business expense of the hotel. The allowance of the entire cost of these tickets should also compensate for the cost of tickets to a few of the specific athletic and social events mentioned above which might have had some business orientation and for which we have allowed no deduction. Cambridge Hotels, Inc., deducted expenditures incurred in each of the 3 taxable years here involved in connection with hotel and apartment-owner *71 associations and various business meetings and trips, totaling $618.94 in 1960, $2,297.65 in 1961, and $459.10 in 1962. Included in this category are expenses of the annual Hotel and Restaurant News Golf Tournament sponsored by a New England trade paper. The expenses involved are relatively small in amount. Respondent has conceded some of the items such as taxi fare to the Federal Housing Administration office, a trip to Hartford, Conn., on business, an Early Bird breakfast, and taxi fare to the Massachusetts Housing Authority office. We are satisfied from the nature of the remaining items as evidenced by the record that they are proximately related to the business of Cambridge Hotels, Inc., and are properly deductible as ordinary and necessary business expenses. However, included in a subcategory of expenditures which the hotel corporation on brief calls related hotel expenses, there appear such items as skating club dues of about $100, in each of the taxable years ended August 31, 1960, through 1962, a trip to Puerto Vallarta, Mexico by Steele and his wife over the period January 22-31, 1961 (about $480), an automobile trip to the South in March 1961 by Steele and his wife (about *72 $1,275) and certain other miscellaneous expenses. We cannot find on this record that the skating club had any connection with the hotel business. The evidence on this expenditure is extremely meager: Steele testified that he went to the club infrequently, that he made some attempts at figure skating, that the club had about 1,000 members, and that he sent hotel guests to the club for skating. We do not believe that Steele's assertion that the hotel derived business because he belonged to the skating club has any support in the record and we cannot find that any portion of these dues was property deductible by the hotel corporation as a business expense. Similarly, the evidence as to the trip made by Steele and his wife to Puerto Vallarta, Mexico, is too vague and unsatisfactory to permit a finding that the expenses incurred on the trip were proximately related to the business of Cambridge Hotels, Inc. Steele testified briefly that he went to Mexico to inspect a resort hotel but was worried about the political situation there and also the distance from Cambridge so he turned down the proposition to buy the hotel. None of this testimony is corroborated by other evidence. We are not *73 told the name of the hotel. We do not even know whether Cambridge Hotels, Inc., was planning to acquire the hotel itself or whether it would be done by a subsidiary, in which case the expenses would not be deductible since they would be organizing or developing expenses of a new corporate entity embarking on a new business. See Morton Frank 20 T.C. 511. On the way back from Mexico, Steele and his wife stopped at New Orleans early in February for a United States Lawn Tennis Association meeting and Steele testified that "I would not have gone to Mexico had there not been a meeting of the USLTA in New Orleans which I had to attend as the delegate and I tried to tie the two together." On this evidence we cannot find that the expenses of the Mexican trip were proximately related to the business of Cambridge Hotels, Inc. It fairly appears that the trip was personal and that Steele merely took advantage of the tennis association meeting in New Orleans in early February to visit Mexico with his wife for about 9 or 10 days. On March 19, 1961, a few weeks after his return from New Orleans, Steele and his wife began a trip to Florida by automobile. Again, the evidence as to *74 the 1421purpose for the trip is vague and unsatisfactory. Steele testified that he intended to build a motel in Cambridge and, at the suggestion of an architect, embarked on a trip to Florida to study motels along the way. He also testified that, due to court action taken by a neighbor who objected to the new construction, the proposed motel was never built. It appears, however, that Steele subsequently built a new apartment building on that site (presumably through a corporation). Once more we do not know with any certainty just who was going to build the proposed motel. In any event, we note from the evidence that on the way south he stopped at a Ponte Vedra Club where he played an exhibition tennis match, and on March 26, Steele and his wife arrived in Miami Beach, Fla., where a Good Neighbor Tournament (tennis) was in progress from March 27 to April 1. Steele played in the tournament. A large part of the expenditures on this trip was incurred for hotel bills for Steele and his wife while staying for about 4-5 days in Ponte Vedra, and for staying at one motel in Miami Beach for 7 days. On the return trip Steele and his wife stopped in St. Petersburg, Fla., where the Masters' *75 Tennis Tournament was in progress from April 4 to April 9. Steele played in that tournament and while there he also negotiated a contract between the United States Lawn Tennis Asociation and the Longwood Cricket Club. We believe that on this evidence it is clear that the automobile trip was not for any business purpose but was undertaken for personal reasons and to participate in the various tennis tournaments along the way. We are convinced on this record that the expenditures were made for personal reasons and, absent any established connection with hotel business of Cambridge Hotels, Inc., such expenditures are not deductible as business expenses by the hotel corporation. There is little or no evidence concerning the few miscellaneous expenses (minor in amount) in the subcategory of related hotel expenses and, in the absence of any showing that such expenses were approximately related to the hotel business of Cambridge Hotels, Inc., we cannot find that the hotel corporation was entitled to deduct them as business expenses. Respondent determined that the individual petitioners received constructive dividends from Cambridge Hotels, Inc., in 1960 and 1961 to the extent that the *76 disallowed deductions claimed by the hotel corporation represented amounts paid for their personal benefit and enjoyment. In Challenge Manufacturing Co. [Dec. 25,304], 37 T.C. 650, this Court held that expenditures made by a corporation for the personal benefit of its stockholders may constitute taxable income in amounts equal to the fair value of the benefits involved. The individual petitioners here do not dispute the validity of this principle. Their only argument is that if any portion of the expenses claimed by the corporate petitioner are held to constitute payments of personal expenses of Steele, the amounts involved should be treated as additional compensation to him and deductible by the corporation. There is no merit in this argument. We have no evidence to show that the compensation actually received by Steele from the corporation was inadequate. The tax returns of the hotel corporation for its taxable years ended August 31, 1960, 1961, and 1962 show Steele's compensation in the respective amounts of $44,543.27, $42,329.69, and $39,149. As far as we can determine *77 from the record, these amounts were considered by the hotel corporation as full and adequate compensation for Steele's services. We have no reason to think otherwise. None of these benefits received by Steele were intended as compensation; they merely represent a method for making available to the corporation's 72-percent stockholder a portion of the corporation's earnings and profits. [9] See Challenge Manufacturing Co., supra. There is no obstacle to the treatment of these benefits as constructive dividends by the facts (1) that Steele was not a 100percent stockholder of Cambridge Hotels, Inc., during the years 1960 and 1961 and (2) that the corporation was not permitted to pay dividends under the terms of an outstanding loan agreement with the Harvard Trust Co. We sustain respondent on this issue. Respondent disallowed deductions claimed by the hotel corporation of $15 per week to Marian E. Steele purportedly for the use of her automobile throughout each of the taxable years *78 ended August 31, 1960, 1961, and 1962. Steele testified that his wife's station wagon was needed to move furniture, furnishings, linens, and silver to the furnished apartments in the various 1422 buildings operated by Cambridge Hotels, Inc. There is no further evidence in the record on this issue apart from this completely uncorroborated and self-serving statement by Steele. We are not told how often the automobile was used, mileage covered, nature of any repairs and maintenance; in short, nothing appears in the record to help the Court reach some decision as to the reasonableness of the claimed deduction. Steele admitted at the trial that the $15 weekly rate was "an arbitrary amount." Indeed, we are not at all certain that the hotel corporation had any need for Marian's automobile. Assuming that some vehicle was occasionally required to move supplies for the hotel corporation, it would seem that this need was met by the use of the automobile belonging to Steele's father who formerly was on the hotel corporation's payroll. The evidence shows that the hotel corporation reimbursed Steele's father during these taxable years at the rate of $50 per month for automobile expenses. We *79 have no way of determining whether there was any corporate need of a second automobile during the taxable years for its limited needs. On this record, there is a strong indication that the $15 weekly rate paid to Marian E. Steele was merely designed to cover her expenses in her personal use of the automobile which, as the evidence suggests, was used by her to a large extent in connection with her art work. At any rate, we cannot find on this evidence that the hotel corporation has met its burden of showing that any portion of these weekly payments to Marian E. Steele represented ordinary and necessary business expenses of the corporation. The next issue is whether the individual petitioners are entitled to a charitable deduction under section 170 in the year 1961 for a portrait painted by Marian E. Steele and contributed to the First Congregational Church in Cambridge. Respondent takes an extreme position and argues that no deduction at all should be allowed because the individual petitioners have failed to establish any value of the portrait. The individual petitioners contend that the fair market value of the framed portrait was $1,100 [10] in 1961 and that they are entitled to *80 a charitable deduction in that amount. If a contribution of property is made to a qualified charitable organization, the amount of the deduction is determined by the fair market value of the property at the time of contribution. Sec. 1.170-1(c), Income Tax Regs. Determination of fair market value at a given date is a question of fact. Philip Kaplan, 43 T.C. 663 (1965). Marian E. Steele has been a professional artist since the middle 1930's. She specializes in portraits and has sold her work throughout the United States. Her work has won numerous prizes at various museums and art associations. Her first commission after graduation from the Academy of Fine Arts in Philadelphia was a portrait (34 inches by 38 inches) of Governor Harold G. Hoffman of New Jersey *81 for which she received $1,200 which, as she testified, was "a good many years ago, my prices have gone up." She testified generally that "My portraits, well, most people charge by size, they start at five hundred dollars, which is a small head and shoulders and is twenty by twenty-four, and they go up to twenty-five hundred dollars or more." The painting donated in 1961 to the First Congregational Church was a portrait (30 inches by 36 inches) of a Dr. Leman who was then the Minister of the church. She testified that it was "worth a thousand dollars at that time" and added that "I charge more for that size now." She also testified that the carved frame had a value of about $100. Marian testified that about 1961 or 1962 she sold a portrait (30 inches by 36 inches) of one E. Bartlett Osborne for $1,000. Respondent did not offer any witness to give an appraisal of the painting donated in 1961 to the Church. We accept the evidence offered by Marian and we hold that the framed painting had a fair market value of $1,100 in 1961, and that the Steeles are entitled to deduct that value as a charitable contribution in 1961. The next issue is whether certain nonbusiness bad debts claimed *82 by the individual petitioners on their 1961 return did in fact become worthless in that year. Steele was cosigner on a note by George Pellinger and also on a note by Edward McCaffrey and on his 1961 tax return reported a short-term capital loss of $1,782.34 on the Pellinger note and a short-term capital loss of $262 on the McCaffrey note. Steele testified that both parties defaulted on their notes and, upon being advised by 1423 the Harvard Trust Co. that both notes were uncollectible, Steele was obligated as cosigner to make the necessary payments. However, respondent introduced in evidence a letter from the Harvard Trust Co. under date of June 9, 1964, to Steele which states that it was not until August 22, 1962, after exhausting every effort to make collection on the Pellinger note, that the Harvard Trust Co. made demand on Steele as cosigner for the balance of the payments which amounted to $1,882.22. Similarly, the letter refers to the McCaffrey note dated February 28, 1961, and merely states (without giving any dates that "After exhausting every effort to collect this account from the McCaffreys, we did make demand on you as co-maker * * *." *83 Whether or not a debt has become worthless within a particular year is a question of fact as to which the burden of proof is upon the individual petitioners. Earl V. Perry, 22 T.C. 968. Steele's testimony as to his payments on these defaulted notes is general in nature with no serious effort to establish the relevant dates. Nor are we certain, quite apart from the time of payment, when any rights that Steele might have obtained against Pellinger and McCaffrey after meeting the payments on their defaulted notes actually became worthless. We are left to conjecture as to these important facts. The evidence in the record strongly indicates that these nonbusiness debts became totally worthless to Steele in some year after 1961. [11] On this record we find that the individual petitioners have not met their burden of showing that the nonbusiness debts here involved became totally worthless in the year 1961 and consequently they are not entitled to any nonbusiness bad debt deduction for that year under section 166. *84 Decision will be entered under Rule 50. Footnotes
1. All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. The total nonbusiness bad debts of $2,044.34 (treated as short-term capital loss under section 166(d)↩ served to eliminate a reported long-term capital gain of $601.33, and the balance of the deduction was limited to $1,000 under section 1211(b).
3. An eleventh category, which the hotel corporation designates as the use of Marian E. Steele's automobile for corporate purposes, will be discussed separately. In a very helpful appendix attached to the brief the hotel corporation has placed the disallowed expenditures in the 11 categories as follows: ↩
F/Y 1960
F/Y 1961
F/Y 1962
Tennis Activities
$4,121.89
$2,754.05
$5,776.81
Golf Activities
2,037.69
1,089.80
1,393.90
Use of Continental
1,041.05
744.27
367.13
Young Presidents' Organization
4,096.63
2.00
877.82
Investment Club
491.25
442.05
528.00
Restaurant Dinners
152.82
296.78
169.57
Social Affairs
153.90
152.25
242.16
Entertainment of Hotel Guests
204.90
155.13
118.50
Sports Events Tickets
398.00
438.38
365.00
Use of Marian Steel's auto
780.00
795.00
780.00
Hotel Associations, Inc
618.94
2,297.65
459.10
4. In order to place this contention in the proper prospective it should be emphasized here that respondent has allowed deductions by Cambridge Hotels, Inc., for other (and presumably more conventional) advertising, promotion, and entertainment during the taxable years ended August 31, 1960, 1961, and 1962 in the respective amounts of $21,516.03, $25,412.62, and $32,512.33.↩
5. Joint exhibit 9-I, which lists the various club dues allowed and disallowed by respondent during the taxable years here involved, does not indicate any dues paid at the Badminton and Tennis Club in the taxable year 1962. No dues are indicated on joint exhibit 9-I for the New England Lawn Tennis Association in the taxable years 1960 and 1962.↩
6. Steele testified that there were "approximately 3,500 to 5,500 [registration] cards a month" at the Hotel Continental, depending on the season, and he estimated that the registration cards selected by him for the calendar year 1959 and placed in evidence numbered about 300. The registration cards for 1960 appear to be approximately the same amount, while the August 1961 registration cards are about 45 in number.↩
7. Steele testified that when he first came to the Hotel Continental about 80 percent of the clientele was residential but by the time of the trial the clientele was about 85 percent transient. A comparison of the rentals received by the Hotel Continental during the taxable years here involved from transient rooms and residential rooms clearly indicates that the hotel's transient business was easily the more important source of revenues. It might also be pointed out that the evidence shows that the revenues from transient business (as well as from the combined transient and residential business) actually declined over the period here involved.↩
8. Steele also participated in the Bermuda Lawn Tennis Championship, while he was in Bermuda, and in the Good Neighbor Tennis Championship, while he was in Miami, during 1960.↩
9. We note from the evidence that Steele spent a good bit of his time away from the hotel on tennis and other trips. He participated in about 10 tennis tournaments in each of the years here involved.↩
10. On page 2 of the statutory notice of deficiency in docket No. 2042-66 the disallowed deduction for the painting is stated in the amount of $1,075; in paragraph 5(a) of the petition it is alleged that the value of the portrait is at least $1,000 and the value of the frame at least $85.↩
11. In their brief the individual petitioners recognize that "it is not clear what portion of the amounts are properly deductible in 1961 and what portion in 1962, particularly in view of Ex. L [the letter from Harvard Trust Co. to Steele]." It should be pointed out here that no deduction for a partially worthless debt is allowed to an individual taxpayer in the case of a nonbusiness debt. Sec. 166(d)(1)↩.